right thing to do. Far better that the SEC is proactive in shutting down a Ponzi Scheme of this size rather than reactive.

48. The letter goes on to identify numerous red flags, from publicly available information, that Madoff was engaged in fraud, including questions concerning:

- the unusual manner in which Madoff structured his business operations;

- the fact that Madoff's firms were funding their operations at extremely high interest rates when cheaper money was available in short term credit markets;

- the fact that Madoff operated his firm with an extraordinary level of secrecy;

- Madoff's strategy could not possibly deliver the returns Madoff was boasting;

- The counter-party credit exposure necessary to support Madoff's alleged strategy would be too large for UBS and Merrill Lynch to handle; and

- In addition to discussions Markopolos had with various Wall Street equity derivative traders (all of whom believed Madoff was a fraud), certain press articles doubted the validity of Madoff's returns.

49. Robert Rosenkranz, the principal of a major investment advisor to wealthy clients, Acorn Partners, was reported in the financial press to have stated that his firm's earlier due diligence of the Madoff firm, based in part on the abnormally stable and high investment returns claimed by Madoff and in part on inconsistencies between customer account statements and audited BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely that the BMIS account statements were generated as part of a fraudulent scheme.

50. At the root of Defendants' culpable conduct is the fact that Madoff unabashedly operated behind a shroud of secrecy that Defendants had to necessarily accede to, in order to place the Feeder Funds's assets under his management. By failing to conduct due diligence on Madoff's operations, or if conducted, a proper one, Defendants breached their fiduciary and contractual duties to Plaintiffs and engaged in a course of business that operated as a fraud upon Plaintiff.

51.  <u>Madoff Publicly Spoke of Secrecy</u>: Madoff perpetuated the secrecy in his public statements. As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry (hereinafter, "*MAR/Hedge* article"): "'[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'" Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

52.  When MAR/Hedge probed into the substance of Madoff's strategy, Madoff deflected the question and invoked his reputation as an industry professional; "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

53.  In essence, dealing with Madoff meant that a fund manager was required to willfully abrogate his or her contractual and fiduciary obligations to the fund's investors in exchange for the benefits of highly consistent returns and the lucrative management fees that flowed therefrom. Defendants were no different in their complicity and fell in line with Madoff's *modus operandi* which dated back to the inception of his practice as an investment manager.

54.  The pressure to remain under the radar was common to all fund managers who dealt with Madoff. In her interview with Frontline, Sherry Shameer Cohen, a registered sales assistant and secretary for the Fairfield Greenwich Group, fund managers of the Fairfield Sentry Funds that were

substantially exposed to Madoff, explained the paradoxical desire to preserve secrecy and inconspicuousness:

> I remember talking to Jeff [partner of the Fairfield Greenwich Group] at that time I had started to transition into becoming a writer, and I said to him: "You know, you're doing really great stuff. Wouldn't it be great to, like, pitch stuff up to *Forbes* or *Fortune* or something like that?"
>
> And he says: "No, no, no. I don't want too much attention being drawn to us. I don't want too many people calling." And that should have tipped me off, because most companies want more customers.
>
> \* \* \*
>
> ***Don't ask, don't tell: That seems to be their unofficial policy.*** As long as the money comes rolling in, why ask? Why jeopardize something?

(Frontline Program, Sherry Cohen) (emphasis added).

55. In her interview with Frontline, Sandra Manzke, CEO of Maxam Capital, the Madoff feeder-fund that Defendants placed their money in, corroborated the "don't ask, don't tell" policy that fund managers uniformly followed with respect to their Madoff accounts:

> **Q:** Did Madoff say to you, "Don't put me on your prospectus"?
>
> **A:** Yes. He did. [. . .] That was one of, always, Bernie's conditions of getting an account.
>
> **Q:** But you've publicly called for transparency. That's transparency.
>
> **A:** Yes. But many funds and investors were very secretive. They didn't mention that they had money with Madoff. It was something you didn't talk about.

(Frontline Program, Sandra Manzke.). Ms. Manzke complied with Madoff's "don't ask, don't tell" policy and remained willfully blind to the myriad warning signs that Madoff was a fraud, in complete disregard of the duties they owed to Plaintiffs.

56. The numerous warnings signs included, but were not limited to, the following:

a. <u>Suspect Strategy</u>: The description of Madoff's split-strike conversion strategy was inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14-year period. Moreover, the returns purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so. Michael Markov, a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them." Between May 1999 and October 2005, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy used by Madoff, sent several complaints to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy. As reported in the *MAR/Hedge* article: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

b. <u>Impossibly Low Correlation to the market</u>: As Markopolos explained in "Red Flag #10" of his 2005 memo to the SEC:

> It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market [as measured by the fund's beta1] where its returns are supposedly being generated from. This makes no sense! The strategy depicted retains 100% of the single-stock downside risk since they own only index put options and not single stock put options.

The performance of a fund that actually employs a "split-strike conversion" strategy would track the market's performance. Markopolos explained in his SEC submission that "In 2000 I ran a regression of BM's hedge fund returns using the performance data from Fairfield Sentry Limited. [BMIS] had a

---

[1] The beta coefficient is used to measure how sensitive the expected performance of an investment is to the market. A beta of zero is not correlated to the market. A positive beta means that the performance will generally follow the market.

.06 correlation to the equity market's return which confirms the .06 Beta that Fairfield Sentry Limited lists in its return numbers." This beta, which indicates almost negligible correlation to the market, is impossible to achieve without losing money. Funds that actually use the split-strike conversion strategy, must sell out-of-the money calls to realize positive returns, but this increases the correlation to the market because this increases the size of the "collar," which makes it less effective at protecting against market moves. In short, the performance of a truly functional "split-strike conversion" strategy is necessarily correlated with the market because, to try to eliminate the correlation with the market (resulting in a beta close to zero), a manager would have to buy in-the-money puts. These puts, however, are prohibitively expensive because the monthly premium to maintain in-the-money puts would eclipse any potential positive returns.

  c. <u>Suspect Market-Timing & Trade Execution Prices</u>: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported results. Additionally, Madoff sent to his clients, paper confirmation tickets reflecting each trade he purportedly made, in addition to the monthly paper account statements, both of which disclosed the price at which each purchase or sale was supposedly made. According to allegations by, *inter alia*, Irving Picard, trustee for the liquidation of BMIS, several monthly account statements and trade tickets reflected trades purchased or sold on behalf of clients' accounts in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question. (*See, e.g., Picard v. Merkin*, No. 08-01789 (BRL) at p. 16, (S.D.N.Y. Bankruptcy, May 6, 2009).) Customer statements that reflected options being traded, likewise should have put Defendants on notice because Madoff's options trades were always profitable, *i.e.*,

---

 The higher the beta the more strongly it follows the market. A beta of one means indicates that the performance of the investment is completely correlated to the market.

{2270 / CMP / 00102406.DOC v5}      20

there was no incentive for a counterparty to continuously take the other side of those trades since it would always lose money. (*See* Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 31.)

    d. <u>Impossible Options Volumes</u>: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes. In particular, the S&P 100 Index options that Madoff purported to trade could not handle the reported trading volume. A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges. Testifying before the House Committee on Financial Services on February 4, 2009, Markopolos explained that *any* hedge fund manager should have been able to determine that Madoff was a fraud based solely on the basis of analyzing options volumes:

| | |
|---|---|
| Markopolos: | A lot of the victims thought that they were getting a highly diversified portfolio. . . . [Madoff] was purporting to own 30 to 35 of the bluest chip stocks, the largest companies in America. And they'd see that on their statements. And they felt very comfortable owning those companies, and they considered it a very diversified basket, because it really was a diversified basket. |
| Rep. Ackerman: | But there was nothing they could do to check it out, that he didn't actually buy it. |
| Markopolos: | You could. As an individual investor you could not. *But as a feeder fund, you should have been able to go to the New York Stock Exchange and see that those volumes of that stock did not trade that day at that price.* They could have gone to the Option Price Reporting Authority that the Chicago Board Options Exchange offers. And you would have seen that no OEX index options traded at those prices that day. |

Testimony of Harry Markopolos before the House Committee on Financial Services, February 4,

2009 (hereinafter, "Markopolos Testimony") (emphasis added). Indeed, the August 31, 2009, SEC OIG Madoff Report concluded that, "a simple inquiry to one of several third parties could have immediately revealed the fact that Madoff was not trading in the volume he was claiming. (Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 39).

   e. <u>No Standalone Hedge Fund</u>: Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much higher than the brokerage commissions he was charging. This is particularly suspicious because a hedge fund requires annual audits. Indeed, the *MAR/Hedge* article highlighted this fact as particularly suspect because BMIS was willing to earn commissions off the trades rather than "set up a separate asset management division to offer hedge funds directly to investors and keep all the incentive fees for itself . . ." In his November 7, 2005 submission to the SEC ("Markopolos SEC Submission"), Markopolos reiterated this peculiar arrangement:

> **MOST IMPORTANTLY,** why would [Madoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits? Doing some simple math on [Madoff]'s 12% average annual return stream to investors, the hedge fund, before fees would have to be earning average annual returns of 16%. Subtract out the 1% management fee and investors are down to 15% [of profits]. 20% of the profits would amount to 3% so investors would be left with [...] 12% annual returns. . . . Total fees to the third party FOF's would amount to 4% annually. Now why would [Madoff] leave 4% in average annual fee revenue on the table unless he were a Ponzi Scheme?

(Markopolos SEC Submission, Nov. 5, 2005, at 3). Fund managers and Investment Advisers, including the Defendants, benefited from this arrangement because obtaining similar services from another hedge fund would have reduced the amount of fees received by Defendants.

   f. <u>Cash Positions</u>: BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions. Indeed, Irving Picard, the court-

appointed trustee charged with sorting out what Madoff assets remain, reported that Madoff never engaged in any trades. Victims' quarter-end and year-end reports often reflected positions in only United States Treasury Bills. As Markopolos explained to the House Committee on Financial Services, this practice was indicative of the underlying fraud being perpetuated by Madoff and was cause for further investigation:

> Markopolos: If you're not holding any financial instruments that are recordable at year-end marking period or quarter-end marking period, especially if you're in treasury bills, which are book entry form only – there's no physical securities there – there was nothing there for the auditors ever to inspect.

(Markopolos Testimony.)

    g. <u>Lack of a Third Party Custodian and Administrator</u>: The Feeder Funds' assets with BMIS were not held by a third party custodian but rather by Madoff himself. Moreover, BMIS initiated trades in the accounts, executed the trades, and served as custodian and administrator for the accounts. Thus, instead of using an outside prime broker as nearly all hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which analyzes hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets . . . There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen." In his interview with the PBS program, *Frontline: The Madoff Affair* (hereinafter, "Frontline program"), Frank Casey, a colleague of Markopolos, explained why relying on the trade confirmations and account statements provided by BMIS was an exercise in futility and did not constitute due diligence:

> Thierry [a French money manager] said: "Well I've been doing this due diligence on [Madoff] . . . I get reports every day of which

> positions are bought, which are sold, and which options are purchased and which are sold." And he had, I remember, two or three clerks logging everything into a computer, all the confirmations that he was receiving from Madoff Securities ...
>
> I said: "Why are you bothering logging in all these pieces of paper? He can make that up. There's no check and balance here. ... I wouldn't even bother having two or three clerks log this thing in. *I would just have one guy, once a week, sit down, look over the trades at the end of the week and see if any of them were trading outside of the day's range."*

Frontline: The Madoff Affair, Interview Transcript of Frank Casey, available at PBS.org (emphasis added).

        h.    <u>Obscure and Ill-Equipped Auditor</u>: BMIS was audited by Friehling & Horowitz ("F&H"), which had three employees, of which one was 78-years old and living in Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in Rockland County, NY, was 13 feet by 18 feet. As Representative Sherman of California remarked during the February 4 testimony of Markopolos before Congress, it was physically impossible for a three person accounting firm staffed with one active CPA to properly audit a $17 billion firm:

> Now it is physically impossible for one CPA to audit a $17 billion firm. But even if it was possible, you're supposed to be an independent auditor. Independence includes not getting more than, say, about a fifth of your revenue from any one client. So unless you think that one CPA could audit a $17 billion operation and be done in a couple of months, you've got a fraudulent financial statement in your hand, not to mention your professional expertise focused on the fact that you cannot earn those kinds of continuously positive, even returns.

(Representative Sherman, Markopolos Testimony.) Indeed, managers of feeder funds who dealt with Madoff early on in his career as an investment adviser harbored reservations about the apparent inadequacy of Madoff's chosen auditor. In his interview with the Frontline Program, Michael Bienes, a money manager who funneled funds into Madoff's operation during its nascent stages expressed his concern about Madoff's accountant, Jerry Horowitz of Friehling Horowitz, P.C.:

> Jerry was a nice guy, very quick, very good. [. . .] And guess what? He was Bernie's accountant. . . . Then I was saying to myself for a second: "What's with this old man? He can't be Bernie's accountant; he's not independent." But Jerry was Bernie's accountant, and Jerry was a one-man show . . .
>
> **Q**: Wasn't that a red flag [that Madoff used such a small accounting firm]?
>
> To me, I was always wondering about it, because . . . [a]uditing is a very labor-intensive business. That's why all the accounting firms wanted to get into consulting. It's just, auditing is so labor-intensive, they can't make a profit. And I was always wondering about Jerry doing this.

Frontline Program Transcript, PBS.org. On March 18, 2009, David G. Friehling ("Friehling") was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's Ponzi scheme. The SEC also filed a civil complaint against Friehling and F&H, alleging that F&H never conducted even minimal audit procedures on Madoff and/or BMIS and failed to confirm that the securities BMIS purportedly held on behalf of its investors actually existed.

      i.    <u>Audit Reports</u>: Audit reports of BMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker – not a firm with $17 billion in customer accounts.

      j.    <u>Family Run Operation</u>: Key positions at BMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece). As noted by a due diligence team from Société Générale's investment bank, a European bank that internally blacklisted Madoff and prohibited the bank from doing business with him, the fact that Madoff's brother, Peter Madoff, was the chief compliance officer at BMIS was a significant red flag that informed their decision to avoid Madoff entirely. Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2008.

k. <u>Lack of Electronic Access</u>: BMIS was supposedly technologically advanced but Funds did not have electronic access to their accounts at BMIS. Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation. This lack of technological sophistication in Madoff's reporting methods aroused the suspicion of Ms. Cohen at Fairfield Greenwich Group:

> So I looked at [the statements from Madoff], and I said, "Something is very strange." Every bank statement, every brokerage house statement that I've ever seen, is usually on a very thick paper, and it's got a big logo emblazoned on it, and it's got lots and lots of small print on the front and on the back. . . . None of that was on there. It just looked as if it came off a typewriter or [a] dot matrix [printer]. . . . ***I mean, it's so easy these days to perpetuate a fraud with something that looks more impressive, but here it looked so unprofessional. . . . And that's why I don't understand how could they not question any of these things. It doesn't look like a normal statement.***

(Frontline Program, Sherry Cohen (emphasis added).)

57. Investment professionals who actually investigated the legitimacy of Madoff's operations concluded, based on the numerous red flags and the absence of any legitimate explanation from Madoff as to how he could generate such consistent results, that his operation must be a fraud.

58. The SEC OIG Madoff Report acknowledges that several private entities concluded that Madoff's investment services were unsavory given the multitude of red flags:

> The OIG also found that ***numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise.*** Specifically, Madoff's description of both his equity and options trading practices immediately led to suspicions about Madoff's operations. With respect to his purported trading strategy, many simply did not believe that it was possible for Madoff to achieve his returns using a strategy described by some industry leaders as common and unsophisticated. In addition, there was a great deal of suspicion about Madoff's purported options trading, with several entities not believing that Madoff could be trading options in such high volumes where there was

> no evidence that any counterparties had been trading options with
> Madoff. The private entities' conclusions were drawn from the same
> "red flags" in Madoff's operations that the SEC considered in its
> examinations and investigations, but ultimately dismissed.

(Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 25)

(emphasis added).

59. For example, the SEC's Investigative Report describes how one CEO of a company with a fund-of-funds business decided to avoid investing with Madoff:

> The CEO was suspicious and obtained copies of an investor's last few
> account statements from Madoff Securities, and compared a sample of
> trades on the statements with what was actually going on in the
> markets on the day Madoff was trading. The CEO stated he found this
> "pattern which really seemed weird where the – where the purchases
> were all at or close to the lows of the day and the sales were at or close
> to the highs of the day," noting that "of course, nobody can do that."
> His "suspicion was that the fact pattern that [he] had seen seemed
> consistent with a Ponzi scheme." The CEO said he "didn't conclude
> that that was the case, but [he] certainly thought there was enough of a
> risk that that was the case that, you know, [he] certainly wouldn't
> touch it with a 10-foot pole."

(*Id.* at 414.)

60. In his 2005 SEC Submission, Markopolos set forth in over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolos identified 29 red flags that were signs of highly suspicious activity in BMIS. Among those already discussed above and several others, he identified the following red flags:

- "It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! ... However, BM's performance numbers show only 7 extremely small [monthly] losses during 14 years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!"

- "Madoff does not allow outside performance audits."

- "Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."

- "Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases [sic] upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows them the extra 10%."

61. As summed up by Markopolos: "If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings. Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management. Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money? Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

62. In 2007, investment manager Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

- The Madoff feeder funds marketed a purported "Split-strike Conversion" strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant analyst.

- It seemed implausible that the S&P 100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion.

- The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

- There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities.

> The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

- Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. The managers had no demonstrated electronic access to their funds accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

- Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

- Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.

63. Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing. The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

64. In addition to the foregoing, investment advisors and professionals, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements

themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

65.     Similar concerns informed Société Générale's due diligence team to internally blacklist Madoff and advise wealthy clients at its private banks against investing with him. Indeed, as Drago Indjic, a project manager at the Hedge Fund Center of the London Business School noted, many European hedge fund companies saw the tell-tale signs of a Ponzi scheme all along:

> Madoff did not pass due diligence for many European hedge fund companies . . . Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is Ponzi scheme.

Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2008.

66.     In July 2008, the managers of the Fort Worth Employees' Retirement Fund heeded the advice of Albourne Partners, a London due diligence firm, and liquidated its $10 million stake in the Rye Select Broad Market Fund, a fund that was entirely invested with Madoff. According to a December 31, 2008 article in BusinessWeek, Albourne Partners had "long-standing concerns about Madoff's trading strategy and consistent returns" and "had urged clients for nearly a decade to avoid affiliate funds such as Rye." Matthew Goldstein, *The Madoff Case Could Reel in Former Investors*, Dec. 31, 2008, BusinessWeek.

67.     Rogerscasey, a domestic registered investment adviser providing investment consulting services globally, issued several adverse ratings of Madoff-related feeder funds such as Fairfield Greenwich and Tremont dating as far back as 2002, "based largely on concerns about the integrity of the Madoff structure." A Rogerscasey newsletter published in December 2008 enumerates the several warnings it issued regarding Madoff:

- June 4, 2002 – We are exceedingly negative on Madoff as a hedge fund.

- November 21, 2002 – [Tremont's] largest exposure . . . is to Madoff . . . Where Tremont receives limited independent third-party transparency. . . . The only third-party, independent transparency that Madoff provides to its investors is being 100% in cash at the end of each year, so that its auditor can verify with Madoff's banker . . . that the cash is real. Madoff has no prime broker and no plan administrator. It acts as a broker/dealer, self-clears, and sends its own trade confirms to its investors all of whom have "cash" accounts.

- February 27, 2003 – [Fairfield Greenwich] claims its due diligence is based on [employee name] at their firm checking the trade confirms that Madoff's broker dealer sends them. However, our point of view is that, since Madoff is self clearing, it could be making up its statements and tickets.

- February 26, 2004 – Although Tremont claims to receive access to Madoff's positions, the magnitude of the exposure and the truth of Tremont's transparency remain extremely disconcerting. . . . *The Madoff exposure is a potential disaster. Even though some products would not be directly affected . . . Tremont's products will still see their reputations vaporized when Madoff rolls over like a big ship.*

Rogerscasey Flash, December 2008 at 1-2 (emphasis added).

68.    The Rogerscasey Newsletter reiterates what Markopolos and several other industry professionals had expressed time and again regarding Madoff's investment strategy, that "Madoff's returns [. . .] were too good to be true." To reach this conclusion, Rogerscasey merely examined the returns of a mutual fund known to employ the so-called split-strike conversion strategy and found that, "there are months, and indeed some years, of negative performance." *Id.* at 2.

69.    The General Partner and GAMCO Defendants willfully ignored what were apparent red flags to many other industry professionals who concluded that investing with Madoff was a mistake because of the high probability that Madoff was either engaged in a fraudulent course of conduct, by front-running or a Ponzi scheme, or simply did not come forward with enough

confirmatory information to satisfy the standard of adequate due diligence. By egregiously disregarding the likelihood of fraud, and failing to investigate the doubtful practices of Madoff, the General Partner and GAMCO defendants abandoned their fundamental duty to perform due diligence as fiduciaries to investors in the Feeder Funds, but nevertheless collected their substantial management and incentive fees. As discussed above, conducting "due diligence" solely based on the information Madoff provided to feeder fund managers could not, in any sense of the term, constitute "due diligence" given the anomalous structure of Madoff's operation. Rogerscasey described the importance of maintaining a high standard of due diligence as follows:

> One key factor for effectiveness in this area is the operational due diligence resources in place at a hedge fund of funds with dedicated, experienced staff that can review the back office and operations of their underlying hedge funds. We consider it best practice in this area that the head of operational due diligence at a hedge fund of funds should have a reasonable level of seniority within the organization and should be in a position to veto investment with any hedge fund where there are operational concerns.

(Rogerscasey Newsletter, at 2-3.)

70.  Madoff's anomalous operational structure warranted a heightened level of due diligence. As noted above, Madoff was his own prime broker and custodian of all the assets he managed. Chris Addy told *The Wall Street Journal* on December 13, 2008 that such conduct was unusual because without an independent custodian, there was no one "involved who could prove the existence of assets." According to Addy, "There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer."

71.  According to Rogerscasey, operational concerns that should prevent an investment from taking place are:

- An independent custodian. Madoff appears to have had custody of the assets within his firm, making it impossible to confirm investors' balances independently.

- An independent administrator to value the portfolio independently and strike monthly net asset values.
- An independent auditor with the expertise to audit potentially complex investment strategies.

*Id.* In dereliction of their duties, the General Partner Defendants and GAMCO ignored what their peers in the industry, after performing the most basic due diligence, found to be unacceptable signs of impropriety. Instead of pulling the Feeder Funds out of Madoff, the General Partner Defendants committed a substantial portion of their assets to his fraudulent scheme while collecting substantial fees. The General Partner Defendants placed their blind faith in Madoff's strategy solely based on his reputation in the industry rather than on an independent evaluation required of a fiduciary.

72. Defendants were presented with a litany of anomalous facts and practices of Madoff and BMIS that made Madoff's representations obviously false, if not dubious to a degree warranting further inquiry. Defendants were thus aware of facts which alerted them to the danger of Madoff's fraud. Moreover, had Defendants conducted due diligence or, if conducted, a proper one, into Madoff, BMIS, and/or Madoff-controlled entities, they would have been alerted to the imminent likelihood of an ongoing fraud in light of the dozens of red flags identified herein.

73. Instead, Defendants relied on the reputation of Madoff without conducting any reasonable investigation of the bona fides of Madoff and his operations, and/or any real analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high over years, even during adverse market conditions. Defendants acted with reckless disregard for the truth and violated their duties by failing to perform, or cause to be performed, appropriate due diligence that would have revealed that assets of the Feeder Funds were invested in a suspect manner suggestive of either a Ponzi scheme or unlawful front-running being perpetuated by Madoff and by failing to monitor the Feeder Funds' investments in these Madoff-controlled entities.